IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-03159-MSK-CBS

BARRY F. LOGAN,

       Plaintiff,

v.

SEARS,

       Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

THIS MATTER comes before the Court on the Motion for Summary Judgment **(#47)** filed by Defendant Sears, Roebuck and Co. ("Sears"), to which the Plaintiff Barry F. Logan[1] responded **(#48)**, and Sears replied **(#53)**. Mr. Logan filed a parallel Motion for Summary Judgment (#45), to which Sears responded (#50), and Mr. Logan replied (#54). Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

**I. Issue Presented**

---

[1] The Court is mindful that Mr. Logan is proceeding *pro se* and, therefore, the Court construes Mr. Logan's pleadings liberally and holds Mr. Logan to a "less stringent standard" than pleadings drafted by lawyers in accordance with *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Such liberal construction is intended merely to overlook technical formatting errors, poor writing style, and other defects in the party's use of legal terminology, citation, and theories. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The Court, however, cannot act as a *pro se* litigant's legal advocate, and a *pro se* plaintiff retains the burden to allege sufficient facts to state a viable claim. Furthermore, *pro se* status does not relieve a party of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court must apply the same standard to counsel licensed to practice law and to a *pro se* party. *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

This is an employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Mr. Logan, who is African-American, is a former employee of Sears. He contends that the termination of his employment was due to race discrimination.[2] Sears moves for summary judgment, arguing that the undisputed evidence shows that it had a legitimate non-discriminatory reason for terminating Mr. Logan's employment and that he cannot come forward with evidence to show that this reason was a pretext for unlawful discrimination. Mr. Logan also moves for summary judgment, seeking a determination as a matter of law that the termination of his employment was discriminatory. The Court will begin by addressing Sears' Motion.

## II. Material Facts

The Court has reviewed all of the parties' submissions. For purposes of this order only, the Court construes all disputed facts most favorably to Mr. Logan as the nonmovant. Viewing the facts in such light, the material facts are as follows.

**A.     Background**

Mr. Logan began working at Sears in March 2007. At the time he was discharged, Mr. Logan worked at the Littleton, Colorado store as an Assistant Store Manager. He was hired in that position by the Store Manager, Josh Melver. Mr. Melver was also Mr. Logan's direct supervisor.

---

[2]Mr. Logan's Complaint (#**1**) contains three claims for relief. The first two are substantially the same and are based on Mr. Logan's contention that his employment was unlawfully terminated. The third claim for relief is for alleged discrimination in the terms and conditions of his employment, specifically that he was given inadequate training because of his race. In his Response brief (#**48**), however, Mr. Logan disavows this claim. Accordingly, the discussion here focuses solely on Mr. Logan's claim of discriminatory discharge.

Sears has an employment manual which contains the company's employment policies. Mr. Logan signed a form acknowledging his receipt of the employment manual when he began working for Sears and agreed to abide by its terms. Ex. B to Def.'s Mot., #**47-2**. The handbook provides that the following conduct could lead to discipline, up to termination:

- "violation of regulations involving the handling of cash, the unauthorized use of the corporate travel card or relocation card, or other Company assets"

- "[h]andling your own transactions, or transactions for members of your family, including sales and refunds"

- "other violations of rules including dishonesty"

Ex. C to Def.'s Motion, #**47-3**, at 19-20. The handbook reiterates in a separate section that it is a "violation of policy to handle your own transaction, or transactions for members of your family, including sales and refunds." *Id*., at 34. Mr. Logan does not dispute that he was subject to the handbook's policies.

Also pertinent to the discussion here are policies governing internal investigations at Sears under its Loss Prevention Policy and Procedures. Ex. 1 to Pl.'s Resp., #**48**. These policies set forth an investigation procedure, evidence handling policies, and other guidance for internal investigations into employee-caused theft and losses. Among other things, the policies provide as follows:

> Validation/Verification: Using available resources, decide whether dishonest activity is occurring and if so what methods are being used. If the validation cannot be obtained or the information is proven to be false, the investigation should be discontinued.
>
> * * *
>
> An interview should take place once conclusive evidence has been

> obtained via the investigation as determined and approved by the
> [District Loss Prevention Manager].
>
> * * *
>
> At the completion of the associate interview, the results of the
> investigation are to be reviewed with the Store General Manager
> and Human Resource. The Decision to terminate will be made
> collectively at this time.

*Id*. These policies also provide a definition for "Associate dishonesty," which is defined as "when an associate . . . causes a loss . . . and/or takes merchandise, cash or property from the Company, another associate, a Vendor, or a Customer without authorization and with the intent to permanently deprive ownership." *Id*.

**B.     Events Leading to Termination**

Around December 5, 2008, Sears National Customer Relations received a complaint from a person named Jennifer Blake about "shady business practices." According to Ms. Blake, Mr. Logan had approached her with a request that she accept $1500 in gift cards to purchase a refrigerator priced at $1,494, which he said he could not purchase for himself because of company policy. She further contended that Mr. Logan offered her $20 to make the purchase.

A Loss Prevention Manager, Tristen Bryce, was assigned to investigate Ms. Blake's complaint. Ms. Blake apparently did not cooperate with the investigation. Mr. Bryce began investigating and discovered several questionable transactions. Most significantly, Mr. Bryce discovered that on November 16, 2008, Mr. Logan had refunded a protection agreement (essentially an extended warranty) valued at $379.99 and issued in the name of Ms. Blake to cash and then applied those funds to his personal credit card.

On December 6, 2008, Mr. Logan was interviewed by Mr. Bryce and the District Loss

Prevention Manager regarding Ms. Blake's complaint and the refunded protection agreement. Mr. Logan provided the following account of what had happened, and executed a written statement containing essentially the same information.

According to Mr. Logan, around October 23, 2008, he had called his mother and told her that a KitchenAid refrigerator that was originally priced at $799 had been marked down to $499.93. Mr. Logan suggested that his mother purchase the refrigerator along with a $379.99 protection agreement.[3] Later that same day, Mr. Logan used his personal Sears credit card to purchase two Sears gift cards, one for $400 and one for $500. He gave the cards to his mother during a break from work. Shortly thereafter, Jennifer Blake purchased the refrigerator and a $379.99 protection agreement in her own name using the gift cards Mr. Logan had given to his mother.[4] Mr. Logan did not ring up the sale personally but was present in the store when it occurred and understood that Ms. Blake was buying the refrigerator on behalf of his mother. However, the refrigerator was never delivered or picked up.

Around November 16, 2008, Mr. Logan called his mother to see what was going on with the refrigerator. His mother told him that she had second thoughts about the purchase. Mr. Logan told her that the protection agreement could be cancelled and that money refunded. According to Mr. Logan, "they" (meaning perhaps his mother and Ms. Blake) agreed that it

---

[3] Because of how the refrigerator had been marked down, Sears employees and their family members were prohibited from purchasing it until it had been on the floor and available for customer purchase for at least 24 hours.

[4] There are a number of different accounts regarding why Ms. Blake made the purchase rather than Mr. Logan's mother. Because Ms. Blake's motivations are not material to the issues to be decided, these factual disputes need not be addressed or resolved. It does not appear that Mr. Logan knew Ms. Blake personally.

would be all right for him to cancel and obtain a refund of the cost of the protection agreement. He then did so, first by attempting to refund the $379.99 directly to his own personal Sears credit card and then later by refunding it in cash.  Mr. Logan concluded his written statement with the following admissions:

> I now understand that the transaction was 'fraudulent' in that I was not the 'owner' of the unit or the [protection agreement] after 'giving' the gift cards away and that I had no right to return someone else's property/money to my account.  If Jennifer Blake would like the money for the [protection agreement] I am completely willing to give her that for 'losses.'  If she does not want it, I will have her cancel it.  I agree to pay Sears $379.99 to replace the [protection agreement] that I should not have received.

Ex. O to Def.'s Mot., # **47-15**.  Mr. Logan also signed a promissory note agreement to repay Sears the $379.99.

The written statement was taken to Mr. Melver.  Shortly after the interview concluded Mr. Melver informed Mr. Logan that his employment was terminated; according to Mr. Logan, Mr. Melver did not give a specific reason other than the "circumstances."  The decision to terminate appears to have been made by Mr. Melver in consultation with the District Manager and the District Loss Prevention Manager.  At an unemployment hearing in March 2009, Mr. Melver and Mr. Bryce both testified that the reason for Mr. Logan's discharge was his violation of Sears' policies in the conduct to which he admitted in his interview, including the policy prohibiting employees' handling their own transactions (or those of their family members) and policies against employee dishonesty.

### III.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proven for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

When the moving party does not have the burden of proof at trial, it must point to an

absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### IV. Analysis

**A.     Applicable Law**

A plaintiff may prove a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a *prima facie* case of discrimination. *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *Garrett*, 305 F.3d at 1216. If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id*.

A plaintiff can meet this burden by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Campbell v. Gambro Healthcare*, Inc., 478 F.3d 1282, 1290 (10th Cir. 2007) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Evidence of pretext "may take a variety of

forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal quotation marks omitted). Again, evidence that similarly situated employees outside of the plaintiff's protected class were treated more favorably may be probative of a discriminatory motive, but in the Tenth Circuit, "[s]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007).

However, in considering whether the employer's reasons are a pretext for discrimination, it is not the role of the Court to decide "whether the employer's reasons were wise, fair or correct." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citations omitted). Rather,

> the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them. Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. Thus, we consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment. The reason for this rule is plain: our role is to prevent intentional discriminatory [employment] practices, not to act as a "super personnel department," second guessing employers' honestly held (even if erroneous) business judgments.

*Id.* (internal quotation marks omitted).

**B.     Application**

Mr. Logan offers no direct evidence of race discrimination and so the *McDonnell*

9

*Douglas* burden-shifting framework applies here.  For the purposes of summary judgment, Sears does not dispute that Mr. Logan has evidence sufficient to establish a *prima facie* case of race discrimination.  It contends, however, that it has a legitimate non-discriminatory reason for its decision and that Mr. Logan cannot show that the reason given is pretextual.

Sears has carried its burden to show a legitimate non-discriminatory reason for terminating Mr. Logan's employment–its belief that Mr. Logan had violated several of its policies in connection with his processing of the refund of the protective agreement.  Mr. Logan's admitted conduct in refunding a customer's protection agreement to himself is reasonably construed as a violation of Sears' policies prohibiting employees' from conducting transactions for themselves or their family member or of engaging in dishonesty.

The burden then shifts to Mr. Logan to proffer evidence showing that this stated reason is mere pretext for unlawful discrimination.  Mr. Logan does not dispute the underlying events, including that he refunded a protection agreement in the name of Jennifer Blake to himself in cash and applied the funds towards his own credit card, or that he admitted to such conduct in an interview with company investigators.

In addition, Mr. Logan offers no evidence of any similarly situated employee outside of his protected class who engaged in the same conduct but received different discipline.  Although he alleged in his Complaint and Response brief that two other sales associates outside of his protected class (Jonathan McCorkle and Ryan Huddleston) engaged in misconduct but were not terminated, these sales associates were not similarly situated to Mr. Logan because they were not managers.  Moreover, Mr. Logan has offered no admissible evidence showing that either of these individuals engaged in or were accused of engaging in similar misconduct.  Therefore, any

dissimilar treatment is not evidence of pretext.[5]

Moreover, because Mr. Melver was the person who both hired Mr. Logan and was involved in the decision to discharge him, an inference arises that he did not act out of discriminatory motives. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (where employee was hired and fired by the same actor within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual).

Finally, there is no evidence that Sears has offered contrary or inconsistent reasons for the termination, which could be probative of pretext. Although Mr. Melver may not have given a specific reason at the time of termination, there is no evidence that Mr. Melver or any other representative of Sears has offered any reason for the termination other than Mr. Logan's conduct with respect to the sale of the refrigerator and the refund of the protection agreement to himself.[6]

In the absence of any evidence that would show that the stated reason for the termination is false, Mr. Logan attempts to show pretext by arguing that his conduct was not culpable and by asserting that there were irregularities in the investigation and decision to terminate his

---

[5]In his Response brief, Mr. Logan attempts to argue that Mr. Bryce is similarly situated because he also violated Sears' policies. As discussed below, there is no evidence that Mr. Bryce violated any policy, much less the policies that Mr. Logan was believed to have violated. Moreover, Mr. Bryce was not employed in the same position as Mr. Logan and there is no evidence that he had the same supervisor. Therefore, Mr. Bryce is not similarly situated to Mr. Logan.

[6]The fact that in some circumstances the representatives have emphasized one policy rather than another does not give rise to an inference that Sears did not have a good faith belief that Mr. Logan had violated Sears' policies, when all of the policies plausibly apply to Mr. Logan's misconduct.

11

employment. In reviewing these arguments, the Court must bear in mind that the relevant inquiry is whether the evidence indicates that the decisionmaker did not in good faith believe that Mr. Logan had violated Sears' policies, examining the facts as they appeared to the person at the time.

First, Mr. Logan contends that he was not trained well enough to avoid engaging in his own misconduct. This is not supported by any evidence[7] and, moreover, is immaterial to Mr. Melver's or the other decisionmakers' state of mind at the time the decision was made. Based on the facts presented, Mr. Melver and the others had reason to believe that Mr. Logan violated Sears' policies and Mr. Logan's argument is not evidence showing that the termination decision was based on any other reason.

Second, Mr. Logan makes several related arguments in which he essentially contends that he did nothing wrong. For example, he asserts that various elements of the events leading up to the transaction at issue were not in violation of policy, including the mark-down the refrigerator, purchasing the gift cards, giving the gift cards to his mother to allow her to purchase the refrigerator, telling his mother about the refrigerator, and receiving her verbal authorization and the original sales receipt to cancel the protection agreement and obtain the refund. Alternatively, Mr. Logan argues that because he was not the owner of the refrigerator, he did not process his own transaction when he refunded the funds to himself.[8]

---

[7] In fact, Mr. Logan's evidence shows that he was offered considerable online training. He admits, however, that he did not really complete his training but rather "clicked through" the computer screens of his training programs without reading them.

[8] This argument, however, proves too much. If the refrigerator and protection agreement were not his, then his refunding the amounts to himself would be theft. If they were his mother's, as he appears to contend, and she gave him permission to refund the protection

Again, however, the issue is not whether the evidence, after the fact, could be interpreted in a different manner. Rather, the question is whether Mr. Melver and the other decisionmakers at the time they made the decision did not have a good faith basis to conclude that Mr. Logan had committed misconduct, as demonstrated by evidence of such "implausibilities, inconsistencies, incoherencies, or contradictions" that the employer's stated reason for the discharge is unworthy of belief. Given Mr. Logan's admissions at the time, there is nothing implausible or inconsistent in the reason given for the termination, even if Mr. Logan now asserts that he did not act wrongfully.

Finally, Mr. Logan contends that the reason given for the discharge is suspect because Sears did not follow its own policies regarding loss investigations. He bases this on the fact that Ms. Blake never complained that she had suffered any loss (in the form of the refund to Mr. Logan) and that the actual conduct she complained of was never verified or confirmed. Mr. Logan also appears to argue that the investigators violated Sears' policies because technically no "loss" occurred; the Court understands him to argue that Sears cannot investigate or interview him unless it has evidence of an actual loss or a customer complaint going to the exact violation of policy underlying the decision.

The investigative policies cited by Mr. Logan do not restrict Sears' discretion to pursue evidence of wrongdoing. Moreover, even if the investigation policies could be construed in the manner Mr. Logan urges, Mr. Logan does not dispute that he engaged in the conduct that the

---

agreement, then he was still processing a transaction for himself and/or a family member. Resolution of who had ownership and whether Mr. Logan had permission may be relevant to the question whether Mr. Logan's promise to pay the monies back to Sears is enforceable, but that is not the legal issue presented in this lawsuit.

investigation revealed (although he disputes the characterization that it amounted to fraud); therefore, there was evidence from which the investigators and Mr. Melver could conclude that Mr. Logan had violated Sears' policies. Mr. Logan's complaints about how the investigators handled the process do not give rise to an inference that the reason given for the termination decision was false or implausible and that the real reason was race discrimination.[9]

To summarize, Mr. Logan has come forward with no evidence sufficient to suggest that the termination decision was based on anything other than Mr. Logan's admitted refunding a customer's purchase to himself, which Mr. Melver and the other decisionmakers had a reasonable basis to believe violated multiple employment policies of the employer. Given this analysis, there are no issues for a jury to decide and Sears is entitled to judgment as a matter of law.

Turning to Mr. Logan's Motion for Summary Judgment, Mr. Logan makes essentially the same arguments but again offers no evidence sufficient to raise an inference that the reason given

---

[9] Mr. Logan also argues that the investigators used fraud to deceive and manipulate him into admitting that his conduct was fraudulent and executing the promissory note. He bases this on the investigators' implying to him that his actions amounted to theft of Ms. Blake's money, which he contends is false because his mother gave him permission to issue the refund and there was no evidence Ms. Blake objected to him receiving the refund. Again, while this may be relevant to whether Mr. Logan owes any debt to Sears, it is insufficient to raise a genuine issue of fact regarding the decisionmakers' good faith as to the reason given for the discharge. While Mr. Logan may disagree that he committed theft or fraud, there was evidence from which the investigators could so conclude as the protection agreement was in Ms. Blake's name but the funds were applied to Mr. Logan's benefit, not hers, and it was not clear whether she had authorized the transaction. Even if she (or someone else) had authorized it, the refund still violated the prohibition on employees' handling their own transactions. Again, in analyzing pretext, the issue is not whether the employer's decision was "wise, fair, or correct" but whether the employer honestly believed its reasons and acted in good faith upon them. Simply because Mr. Logan had another explanation for the facts does not mean that the investigators were required to believe him, or that their conclusion that his conduct violated Sears' policies was a pretext for race discrimination.

by Sears for his termination is false and is in fact a pretext for race discrimination. He therefore cannot establish the elements of his claim.

**IT IS THEREFORE ORDERED**:

1. The Motion for Summary Judgment **(#47)** filed by Defendant Sears, Roebuck and Co. is **GRANTED**.

2. Mr. Logan's Motion for Summary Judgment (#**45**) is **DENIED**.

3. The Clerk of the Court shall enter judgment in favor of Defendant Sears and against the Plaintiff on all claims and close the case.

4. Sears may have its costs.

Dated this 18th day of July, 2012

                                              **BY THE COURT:**

                                              Marcia S. Krieger
                                              United States District Judge